T.C. Memo. 1999-132


UNITED STATES TAX COURT


CHARLES A. BUDA AND ANNETTE H. BUDA, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16309-96.                    Filed April 21, 1999.


Robert S. Marquis, for petitioners.

Kirk S. Chaberski, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


FOLEY, Judge:  By notice dated July 17, 1996, respondent
determined a $1,181,285 deficiency in petitioners' 1988 Federal
income tax.  The issues for decision are as follows:

1.  What was the nature and value of the leasehold interest
that Mr. Buda received on liquidation of his wholly owned S
corporation?  We hold that Mr. Buda received the right to use,

and receive all income from, the underlying realty and that the fair market value was $5,200,000.

2.  Did Mr. Buda, pursuant to section 333, make a valid election to defer the recognition of gain on the liquidation?  We hold that he did not.

3.  Were petitioners entitled to deduct an abandonment loss? We hold that they were not.

All section references are to the Internal Revenue Code in effect for the year in issue.

### FINDINGS OF FACT

Petitioners, husband and wife, resided in Pigeon Forge, Tennessee, at the time they filed their petition.  In 1969, C.A. and Bessie King leased approximately 11 acres of land to Mr. Buda, and Mr. Buda assigned the lease to B & M Development Co. (B & M), a corporation he owned with two other shareholders.  In 1978, B & M extended the duration of the lease from 1978 to 2028. The lease and the assignment were recorded in Sevier County, Tennessee.

In 1977, B & M subleased approximately 5 acres of the Kings' property (5 Acre) to Mountain Ocean Corporation. (MOC), an S corporation that, at the time of the sublease, was owned by Mr. Buda and three other shareholders.  The sublease, which was recorded, grants MOC a leasehold interest in 5 Acre through 2028. After entering into the sublease, MOC constructed a wave pool facility on the property.  In 1984, Mr. Buda acquired 100 percent of MOC's stock.  During that year, MOC, in response to a dramatic

increase in insurance costs, permanently closed the wave pool facility and attempted to sell the wave pool equipment. When these attempts were unsuccessful, MOC dismantled the equipment and moved it to another location where it remained in storage through 1988.

In 1984, Mr. Buda began converting 5 Acre into Z Buda Outlets, a retail outlet mall. MOC and Mr. Buda borrowed $1,461,000 from Citizens National Bank (the bank). Proceeds of the loan were used to fund construction work on 5 Acre. As collateral for the loan, MOC assigned the bank the leasehold interest in, and right to all rental income from, 5 Acre. As additional collateral, Mr. Buda assigned interests in two other parcels of realty that he held in his individual capacity.

The shops in the mall were leased to various businesses. Mr. Buda signed, either in his individual capacity or as president of MOC, the leases and related amendments and assignments. All cash transactions relating to the operation of the mall were processed through a bank account under the name "Z Buda Factory Outlets". The mall's income and expenses were reported on petitioners' records and tax returns. The expenses reported by petitioners for 1985, 1986, 1987, and 1988 included $30,000 in rent payments, which were reported as income on MOC's records and tax returns.

On December 30, 1988, MOC was liquidated. Its leasehold interest in 5 Acre and all other corporate assets were distributed to Mr. Buda. On his 1988 return, Mr. Buda reported

the liquidating distribution (i.e., $393,071 of property received, a $495,401 stock basis, and a resulting capital loss of $102,330).  On its 1988 return, MOC reported an $82,189 abandonment loss relating to the wave pool equipment.  Mr. Buda, MOC's sole shareholder, reported this loss on his 1988 return.

OPINION

I.   Nature and Value of the Leasehold Interest

The amount realized on liquidation of MOC is in dispute. More specifically, the parties disagree about the nature and value of the leasehold interest in 5 Acre that Mr. Buda received. Respondent contends that the leasehold interest in 5 Acre included the right to use, and receive all income from, the property.  Petitioners contend that MOC subleased 5 Acre to Mr. Buda for $30,000 per year and that, on liquidation, Mr. Buda received the right to the $30,000 annual payments.  The nature of the leasehold interest received by Mr. Buda, therefore, turns on whether MOC subleased 5 Acre.

Petitioners assert that MOC entered into an oral sublease with its sole shareholder, Mr. Buda.  Mr. Buda and Daniel Cooper, Mr. Buda's accountant, testified.  Their testimony relating to the terms of the oral sublease was vague and contradictory. Moreover, neither witness could offer the Court any explanation why this sublease was not in writing, while all other agreements relating to 5 Acre were in writing (i.e., Mr. Buda's lease with the Kings, his assignment of that lease to B & M, and B & M's sublease to MOC).  Furthermore, the record controverts

petitioners' contention.  For example, the bank required MOC to pledge its leasehold interest in, and right to all rents from, 5 Acre, and MOC consented to assignments of leases.  In short, petitioners' contention is meritless.

Petitioners emphasize that the records relating to the operation of the mall were consistent with the alleged oral sublease (i.e., maintaining a separate checking account for the activity, reporting the activity on Mr. Buda's income tax returns, and recording the $30,000 rent payments on Mr. Buda's and MOC's books).  While these records may be consistent with a sublease, they are not convincing evidence of a sublease.  See Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971) (stating that we closely scrutinize transactions between shareholders and their closely held corporations because such transactions are easily manipulated), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).  We conclude that MOC did not sublease 5 Acre to Mr. Buda and that, upon liquidation of MOC, Mr. Buda received the right to use, and receive all income from, 5 Acre.

Respondent determined that, on the date of liquidation, the fair market value of the leasehold interest in 5 Acre was $5,200,000.  Respondent's assumptions were reasonable, and his analysis was thorough.  Petitioners' contention that the fair market value should be lower (i.e., $4,850,000) was unpersuasive.  Accordingly, we sustain respondent's determination relating to the gain realized on liquidation of MOC.

II.  Section 333 Election

Respondent contends that petitioners did not make an election under section 333 and, thus, are not eligible to defer the gain relating to MOC's liquidation.  Petitioners contend that they made a valid election under section 333 and, thus, may defer the gain.

Congress, in 1986, repealed section 333 but provided a transition rule that allowed certain shareholders to elect to defer gain realized from a liquidating distribution received before January 1, 1989.  See Tax Reform Act of 1986, Pub. L. 99-514, secs. 631(e)(3), 633(d), 100 Stat. 2085, 2273, 2278-2279, as amended by Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1006(g), 102 Stat. 3342, 3407.  The election was required to be in writing and filed by the shareholder on Form 964, Election of Shareholder Under Section 333 Liquidation, within 30 days after the adoption date of the liquidation plan. See sec. 333(d); sec. 1.333-3, Income Tax Regs.

The parties agree that the Internal Revenue Service did not receive Form 964.  At trial, Mr. Cooper delineated in great detail the circumstances under which he allegedly mailed Form 964, yet during the course of the 4-year audit he inexplicably failed to mention any of this to the Internal Revenue Service representatives.  Mr. Buda's testimony relating to this issue (i.e., that he signed "some forms" on a "Sunday afternoon") was similarly unpersuasive.  We conclude that petitioners did not

make a section 333 election.  Accordingly, petitioners must recognize the gain relating to MOC's liquidation.

III. <u>Abandonment Loss</u>

Respondent disallowed petitioners' 1988 abandonment loss because petitioners failed to establish that MOC abandoned the wave pool equipment in that year.  Section 165(a) permits a deduction for any loss sustained during the taxable year that is not compensated for by insurance or otherwise.  To be entitled to an abandonment loss, petitioners must prove an intent to abandon, coupled with an act of abandonment.  See <u>Massey-Ferguson, Inc. v. Commissioner</u>, 59 T.C. 220, 225 (1972).  The loss is allowed for the year in which the act of abandonment takes place.  See sec. 1.165-1(d)(1), Income Tax Regs.

MOC may have abandoned the wave pool equipment in 1984 (i.e., the year MOC dismantled, moved, and attempted to sell the equipment) but did not abandon the equipment in 1988--the year the loss was reported.  Accordingly, petitioners are not entitled to an abandonment loss.

All other contentions are irrelevant or moot.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.